IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| LINDA B. YOUNG,<br><br>    Plaintiff, | ORDER AFFIRMING THE COMMISSIONER'S DECISION AND DENYING LINDA YOUNG'S MOTION FOR JUDGMENT ON THE PLEADINGS |
| vs. | |
| JO ANNE B. BARNHART, Commissioner of Social Security,<br><br>    Defendant. | Case No. 2:05-CV-00144 PGC |

Although proceeding along a slightly circuitous route, this is an appeal from the denial of plaintiff Linda Young's application for Disability Insurance Benefits and Supplemental Security Income benefits under Title II of the Social Security Act, 42 U.S.C. § 405(g). Ms. Young seeks judicial review of the decision of the Commissioner of Social Security denying her claim. Finding that there was substantial evidence supporting the decision to deny Ms. Young DIB and SSI benefits, the court affirms the Administrative Law Judge's and Social Security Commissioner's decision. The court also denies Ms. Young's motion for judgment on the pleadings [#9].

## I. PROCEDURAL HISTORY

Ms. Young filed an application for disability insurance benefits on May 2, 1997, alleging disability since December 15, 1996, due to left shoulder problems, mental stress and depression. Initially the Social Security Administration denied Ms. Young's claims and she requested a reconsideration hearing before an ALJ. After a hearing on January 28, 1998, the ALJ issued a decision on July 23, 1998, finding Ms. Young not disabled because she could perform a range of sedentary work and could perform jobs existing in significant numbers in the national economy. On September 3, 1999, the Appeals Council denied Ms. Young's subsequent request for review and adopted the ALJ's decision as the Secretary's final decision.[1]

In November 2000, Ms. Young appealed the final decision to this court. On May 2, 2002, during the pendency of that appeal, Ms. Young also filed a second application for benefits. In that application, Ms. Young claimed disability from July 24, 1998, a day after the first ALJ decision.

On August 28, 2002, this court issued a ruling on the first ALJ decision. In that ruling, the court found that the ALJ failed to apply the correct legal standard, that the ALJ's decision was not supported by substantial evidence, and that the Commissioner's decision should be reversed. It remanded the appeal for further administrative proceedings. The Appeals Council then vacated the first ALJ decision and consolidated the two applications (the one filed for a period from December 15, 1996 through July 23, 1998, and the one filed for a period from July 24, 1998 forward), and remanded the applications for a new hearing.

---

[1] *See* 42 U.S.C. § 405(g); 20 C.F.R. § 404.981.

On March 20, 2003, the ALJ conducted a second hearing at which Ms. Young requested a closed period of disability from December 15, 1996 until May 8, 2000.  On June 19, 2003, the ALJ issued a second decision finding a closed period of disability for Ms. Young from August 28, 1998 until May 8, 2000.  The ALJ found, however, that Ms. Young was not disabled between December 15, 1996 and August 27, 1998, because she could perform a range of limited sedentary work and could perform jobs existing in significant numbers in the national economy.  In effect, this decision continued the denial of Ms. Young's first application for disability benefits, but approved Ms. Young's second application.  Ms. Young again requested review of the ALJ's decision, and the Appeals Council again denied her request for review.  She now brings this action seeking judicial review of the Commissioner's decision denying her application for disability insurance benefits from December 15, 1996 through August 27, 1998.

## II. FACTUAL HISTORY

For the purposes of this appeal, the court finds the following facts.  On December 15, 1996, the date of her alleged onset of disability, Ms. Young was 43 years old.  She had a high school education and previously worked as a cashier and food server.  Ms. Young claimed she became disabled on December 15, 1996, due to a left shoulder injury requiring multiple surgical procedures, mental stress and depression.

Prior to the onset date, Ms. Young underwent five surgical procedures on her left shoulder after a motor vehicle accident two years earlier.  On September 6, 1996, she saw Mark Edwin, M.D., for "persistent left shoulder pain," hypothyroidism, and gastritis.  Dr. Edwin treated Ms. Young with medication.  On September 20, 1996, she saw Neil Motzkin, M.D., for

"left shoulder pain of unclear etiology status post trauma and multiple surgeries." Dr. Motzkin noted Ms. Young was tender over the left acromioclavicular joint and treated her with an injection and medication for pain. Posterior subluxation testing also relieved Ms. Young's pain.

Ms. Young saw Drs. Motzkin and Edwin several more times. On October 3, 1996, she complained of right wrist pain, although x-rays of her right hand were normal. Dr. Edwin diagnosed arthralgia and recommended she continue anti-inflammatory medicine and use a wrist splint. The next day, Ms. Young saw Dr. Motzkin and explained she had 50% pain relief for the week following her left shoulder injection. Dr. Motzkin assessed Ms. Young as having left shoulder pain of unclear etiology, noting that at most 50% of her pain was coming from the subacromial space. The doctor also noted that she had overused her right wrist, but that a specific diagnosis was unclear. Besides taking anti-inflammatories, Ms. Young was given a short arm cast, a solution of Marcaine and Kenalog into her left AC joint, and told to have the areas rechecked in a month.

On October 29, 1996, she returned and complained that her pain had recurred, following three weeks of 100% pain relief. Dr. Motzkin reinjected her AC joint in the shoulder with the previous Marcaine and Kenalog solution, and removed the wrist cast so that Ms. Young could use it as a splint. Ms. Young also saw a new doctor, Dr. Lee Thurston, who noted that her last thyroid stimulating hormone test had come back as normal. A month later, on November 26, 1996, Ms. Young again saw Dr. Motzkin. She reported significant relief for two or three weeks following the left AC joint injection, but also reported that the pain subsequently returned. The doctor noted that "makes two injections in a row into the left AC joint which provided significant

relief.  Unfortunately, her pain has recurred."[2]  Dr. Motzkin then recommended distal clavicle

excision and they discussed the risks, benefits and alternatives of such a decision.

On December 15, 1996, Ms. Young underwent a distal clavicle excision.  On January 14,

1997, at her follow-up visit, Dr. Motzkin recommended "passive and active assisted range of

motion exercises" for her left shoulder for one month, and also noted that she "understands that I

expect her to have full motion by the end of the month."[3]  If she lacked full motion, Dr. Motzkin

stated the doctors would recommend therapy.  On March 14, 1997, Ms. Young returned for an

examination, stating that she had improved 50% but had not reached what she felt to be normal.

Dr. Motzkin noted that "her range of motion is quite good [and the] wound has healed up fine."[4]

He also noted that Ms. Young had now had six surgeries and should not have anymore.

Additionally, Ms. Young was "quite upset with the fact that she still has pain."[5]  Dr. Motzkin

wrote that as far as he was concerned, "the patient is now permanently partially disabled with

respect to the left shoulder.  She needs a disability rating from someone as I do not do this."[6]  He

also recommended a pain management center to deal with the pain, but stated that he did not

think there was much more he could do to help Ms. Young further.

On another visit on May 9, 1997, Ms. Young reported no real effect from the surgery and

---

[2] Administrative Record, at 174.

[3] *Id*. at 171.

[4] *Id*. at 170.

[5] *Id*.

[6] *Id*.

quite a bit of pain.  Dr. Motzkin diagnosed her again with chronic left shoulder pain attributed to

multiple surgeries and trauma.  Ms. Young requested additional injections, and was obviously

upset about the state of her shoulder, but Dr. Motzkin prescribed certain medication and decided

to recheck as needed.  Ms. Young reports that she then underwent a residual functional capacity

assessment by a non-treating, non-examining physician on May 27, 1997, but the record does not

reflect this assessment.[7]

On July 23, 1997, Dr. Motzkin answered questions posed to him by Ms. Young's

counsel.  When asked whether he expected to be an improvement in Ms. Young's pain, he

answered "No."  When asked if there was an objective basis for Ms. Young's pain, he answered

"Consistent painful physical exam over time."  And when asked if it was reasonable for Ms.

Young's pain to be of such severity that she must miss two to three days of work per week, he

answered "Yes."[8]

In August 1997, Nathan Momberger, M.D., and Robert T. Burks, M.D., assessed Ms.

Young's condition.  Drs. Momberger and Burks found no significant degenerative joint disease,

assessed chronic left should pain of unknown origin, and set up a consultation for pain service.

From August 27, 1997 through April 7, 1998, Ms. Young received treatment at the Pain

Management Center.  Ms. Young reported that she slept around six hours a night but woke once

each night for medication.  She "was very clear upon elicitation of her history that over the past

---

[7] Ms. Young points to p. 190 of the Administrative Record, but p.190 indicates treatment
dates of February 2, 1998 through April 7, 1998,

[8] A.R. at 166.

several years physical therapy has not improved her treatment and she did not desire to engage in physical therapy."[9]  She described her mood as very depressed, but noted it had improved with certain medication over the last three months.  Ken Johnson, M.D., and Bradford Hare, M.D., Ph.D., noted that Ms. Young's left shoulder demonstrated decreased range of motion in abduction, flexion, and extension, although external and internal rotation were normal.  A subsequent neurological examination revealed normal elbow flexion and extension strength, but slightly reduced shoulder strength.  It also noted close to a fifty percent reduction in grip strength on her left side.   The Pain Management Center's impression was that Ms. Young had chronic left shoulder pain, myofascial pain syndrome, and sleep disorder.

On September 8, 1997, Ms. Young met with Dr. Hare.  She reported her pain unchanged and as bad as ever.  She also reported that she had "been subjected to physical therapy in the past and is not interested in repeating this.  She is quite adamant on this point. . . . Apparently, she was told by her surgeon in Arizona that more physical therapy would not be helpful. [She] has given up on improving function and says she would like to decrease her pain but is obviously interested in getting a Disability rating."[10]  Dr. Hare's assessment included chronic left shoulder pain, myofascial pain syndrome, sleep disorder and depression.  After discussing possible treatment plans, Ms. Young "again was very focused on her disability and convinced that she will never return to normal function."[11]

---

[9] *Id.* at 240.

[10] *Id.* at 236.

[11] *Id.* at 237.

On September 29, 1997, Ms. Young returned for more consultations with the Pain Management Center and agreed to enter the multidisciplinary program at the Center.  On January 8, 1998, Dr. Hare reported Ms. Young had 50% decreased range of motion with her left arm raised in front and out laterally to her side.  She did have good range of motion with her left arm in front of her body when not being raised above the level of her shoulder.  On January 26, 1998, she returned again to start treatment, receiving instruction in stretching and a home exercise program.  She also received trigger point injections and therapy.

On February 2, 1998, Ms. Young reported increased pain, no noticeable improvement, and an increase in pain after trigger point injections.  On February 5, 1998, Ms. Young reported some increased shoulder pain after the trigger point injections and difficulty in completing her home exercise program.  Additionally, she had difficulty completing her recommended activities during pool therapy as well.  After five trigger point injections, she reported significant decrease in pain and burning in her left shoulder.  On February 9, 1998, she reported that the burning and severe pain had settled down and was somewhat improving.  After further trigger point injections, her pain reduced, her range of motion increased and her strength improved.  After missing an appointment, she returned on February 18, 1998, reporting that her pain had flared to its original level.  She did indicate she had been doing her stretching and exercises.  On February 24, 1998, Ms. Young reported some gradual improvement, good results from the trigger point injections and some flare in pain.  Dr. Burks began Methadone treatment as Ms. Young reported a decrease in the efficacy of Tylenol #3.

On February 27, 1998, Ms. Young underwent a behavioral medicine evaluation. Formal

testing on the Beck Depression Inventory resulted in a score of 33, which indicated that Ms. Young had "moderate-to-high level of depression."[12]  Ms. Young also indicated, compared with other pain patients, a slightly lower level of pain severity and a much higher level of perception regarding how the pain interferes with her life.  The evaluating doctors noted a moderately high degree of emotional intensity and her profile exhibited many symptoms of depression and anxiety.  She was diagnosed with dysthymic disorder, a generalized anxiety disorder, and a pain disorder associated with psychological factors.

Previously, on July 27, 1997, Steven Fox, Ph.D., performed a psychiatric consultation at the State agency's request.  He reported that Ms. Young was alert, fully oriented, had no delusions, hallucinations or illusions.  Her concentration, intellectual functioning and verbal abstraction appeared to be average, but her recent memory was low average.  Dr. Fox diagnosed Ms. Young with pain disorder and adjustment reaction with depressed mood following her accident.

On June 4, 1998, Ms. Young indicated she had pain in her left shoulder, but also stated that she had not been engaging her home exercise program or her self-management techniques. She complained of a poor appetite and increased weight, rating her depression on a scale of 7/10. The doctors assessed her with left anterior shoulder pain, depression, generalized anxiety disorder, sleep disturbance, non-compliance with her home exercise program and self-management techniques, high focus on obtaining disability and high somatic focus.  On a July 27, 1998 visit, Ms. Young reported 5/10 pain in her shoulders and 7/10 pain in her lower

---

[12] *Id*. at 221.

extremities.  The doctors assessed depression, general anxiety disorder, sleep disorder, left shoulder pain, non-compliance with her home exercise program and a focus on obtaining disability.

On August 10, 1998, Ms. Young reported that methadone controlled her pain and that pain had not been a primary issue at that time nor a significant issue for her.  Instead, she reported that she was slipping back into depression, especially experiencing frustration and increased frequency of emotional episodes.  She had been given a psychiatrist recommendation and had made an appointment, but she did not remember who with or when the appointment was scheduled.  She stated that she was thinking about admitting herself, but also reported no complaints about sleeping and not as much concern about her shoulder pain.   Doctors then diagnosed Ms. Young with a large infiltrating ductal carcinoma of the left breast, and the ALJ determined that she became disabled at that point.  She began to undergo treatment for her cancer, including a partial mastectomy and left axillary dissection.

Finally, in an October 12, 1998 visit, Ms. Young returned to the clinic and rated her pain as 5/10, but not constant.  She stated that the pain tapered down from time to time, that the pain was stable, and "admits to the pain going away and the methadone helping her."[13]  The doctors noted left shoulder pain, depression, generalized anxiety disorder, sleep disorder, poor coping skills, deconditioning, non-compliance with home exercise program and problems in obtaining disability.  On May 8, 2000, Ms. Young returned to work.

On January 28, 1998, as part of her disability case, Ms. Young testified at a hearing held

---

[13] *Id*. at 481.

before the ALJ.  She testified that the pain in her left upper extremity was the only problem that prevented her from working.  She also stated that she was in pain all the time, and on average, her pain level was a 5/10.  Ms. Young noted that sometimes the pain was so bad that she would have to lie down, also noting that her pain was relieved some by medication, lying down and application of ice or heat packs.  Additionally, her medications made her very tired.

Ms. Young testified that a typical day consisted of her helping her husband leave for work, going back to bed until 9 a.m., showering, doing light housework, napping, and watching television.  She could wash dishes, clean the kitchen, vacuum, dust, and do light laundry, but needed to rest between chores.  Approximately once a month she would visit relative in Provo, and she had no problems driving because her right hand was dominant.  She could lift ten pounds with her right arm and had no problems sitting, standing, or walking.

On March 20, 2003, Ms. Young testified at a second administrative hearing after the consolidated case had been remanded back to the ALJ.  She testified that she had nothing to add to her previous testimony about her condition through January 1998.  At that hearing, she testified that she remembers mostly resting during the closed period from December 30, 1996, until January 1998, and that she required assistance lifting groceries if she went grocery shopping.  She testified she did not have time limitations when she went out to do grocery shopping, but that the lifting of groceries was the difficult part for her.  She later testified that she actually had a time limitation of an hour when she went out to do shopping during the closed disability period in question.  She also testified of memory problems during that time period due to medications she was taking, mentioning her inability to remember some conversations or

losing time periods because she was tired and drowsy.

At the second hearing, the ALJ heard vocational testimony from Dina J. Galli, a vocational expert. The ALJ requested Ms. Galli to work through certain situations relating to an individual and whether they could perform sedentary work. Specifically, the ALJ asked Ms. Galli to

> Assume an individual who could do a full range of sedentary work. Typically, the lifting would be in the range of five to ten pounds . . . . She could do the standard sedentary lifting and carrying of lighter articles on an occasional basis, but with regard to the standing or wlaking which takes more energy, she would be limited to, say, 15 to 20 minutes at a time. 30 to 45 minutes would be the sitting, so typically, about two hours on her feet and about six hours in a seated posture, could do no overhead lifting or reaching. Because of fatigue, could do no significant stair climbing. Non-exertionally, she would be limited to jobs of low stress, which means low production rate work and working only occasionally with the general public. Also, concentration levels due to the residual effects mentally of the conditions would cause her to have to require low concentration work. That's defined as still being alert and attentive, but not being able to do more concentrated tasks like reading, writing, computing and the like. Finally, the memory level again would be lower, ability to handle simple instructions with the option to use memory aides and only minimal changes in the work instructions from week to week. Finally, to review, she could do no driving. That would be too concentrated of a task for her. No stretching of any significance. That's reaching out in front and stretching up and down with the upper extremities. No pushing or pulling of any significance. No sweeping. That would be too exertional. No mopping, again, too exertional. And no significant bilateral upper extremity activities. That would mean typing would be a bilateral upper extremity activity. And finally, no significant left arm and shoulder use . . . . So she is right-hand dominant, no significant left arm and shoulder use due to the problems with the impairment there.[14]

Ms. Galli stated that such an individual could not perform Ms. Young's past relevant work as a waitress because it constituted light semiskilled work. Ms. Galli did identify three unskilled sedentary positions, including telephone quotation clerk (80,000 in the national economy), call

---

[14]*Id*. at 732-34.

out operator (120,000 in the national economy) and semi-conductor bonder (40,000 in the national economy).  Because Ms. Young could not engage in typing or bilateral upper extremity fingering, Ms. Galli reduced the number of available jobs by 50%, 75% and 33% respectively. The ALJ then asked a further hypothetical question regarding the effect of fatigue reducing job performance by 25% below average three days a week.  With regard to that hypothetical, Ms. Galli responded that such a limitation would not be tolerated by employers.

Under further questioning by Ms. Young's counsel, Ms. Galli recognized further limitations.  First, Ms. Galli testified that the semi-conductor bonder was not a production job, but did require exposure to moving machinery.  She also testified that the telephone quotation clerk job would be precluded by Ms. Young's limitation of only occasional contact with the general public.  Finally, Ms. Galli testified that the call out operator job did not require contact with the general public, but rather contact with client.  Additionally, she testified that this job was not a production job.

On June 19, 2003, the ALJ issued a decision on Ms. Young's disability claims between December 15, 1996 through May 8, 2000.  Using the five-step sequential evaluation process,[15] the ALJ found Ms. Young not disabled from December 15, 1996 through August 27, 1998. Because the ALJ found Ms. Young able to perform unskilled sedentary jobs existing in significant numbers in the national economy, the ALJ denied Ms. Young's disability insurance benefits claims during that time.  The ALJ did find, however, that Ms. Young became disabled on August 28, 1998, when she was diagnosed with breast cancer, and remained disabled until

---

[15] 20 C.F.R. § 404.1520; *Fisher-Ross v. Barnhart*, 431 F.3d 729 (10th Cir. 2005).

May 8, 2000, when she returned to work.

The ALJ found at step one that Ms. Young had not performed an substantial gainful activity during the closed period of disability, from December 15, 1996 through May 8, 2000. At step two, the ALJ found that the objective medical evidence established that Ms. Young's physicians had diagnosed and treated severe impairments from the onset date. Furthermore, the ALJ found that these severe impairments were reasonably expected to produce Ms. Young's complained-of symptoms, were of sufficient duration, and combined to more than minimally limit Ms. Young's ability to perform basic work functions.

At step three, however, the ALJ concluded that Ms. Young's severe impairments did not meet or equal any listing of impairments under Appendix 1 of the regulations. Specifically, the ALJ reviewed the clinical, laboratory and x-ray findings of the record, concluding that these did not establish an impairment that met or equaled, singly or in combination, an impairment listed in Appendix 1 under the evaluative standard of 20 C.F.R. §§ 404.1525, 404.1526, 416.925 and 416.926. The ALJ provided special review to sections §§ 1.02, 1.08, and 13.09. Additionally, Ms. Young claimed she suffered from depression and generalized anxiety disorder, which required her to establish at least two of the following severity requirements under §§ 12.04 and 12.06 of 20 C.F.R. Part 404, Subpart P., Appendix 1:

1. Marked restriction of activities of daily living; or
2. Marked deficiencies in maintaining social functioning; or
3. Marked deficiencies in maintaining concentration, persistence, or pace; or
4. Repeated episodes of decompensation, each of extended duration.[16]

---

[16] *Id.* §12.04(B).

Based on the medical evidence in the record and the testimony at the hearing, the ALJ concluded that Ms. Young had a mild degree of limitation in her daily living activities, moderate difficulty in maintaining social contact, moderate limitations of concentration, persistence and pace, and no episodes of decompensation.  The ALJ further found that Ms. Young had not demonstrated any further evidence meeting the criteria of these listings.  Therefore, at step three, the ALJ found Ms. Young's impairments did not meet or equal any listing of impairments under Appendix 1 of the regulations.

At step four, the ALJ analyzed Ms. Young's residual functional capacity and her past relevant work.  He found that with appropriate treatment and medication and the proper work environment, Ms. Young's pain, symptoms and precipitating and aggravating factors could have been controlled to allow her to perform significant but a limited range of work activity from December 30, 1996 through August 27, 1998.  Additionally, the ALJ found that Ms. Young's failure to follow through with recommended treatment continued to negatively affect her credibility.  Indeed, the ALJ pointed out that, contrary to the court's understanding that Ms. Young did not refuse physical therapy, it was clear that Ms. Young did in fact refuse to participate in certain therapies.  Therefore, the ALJ found that Ms. Young's failure to follow prescribed treatment should not be construed in her favor in evaluating her impairments and residual functional capacity.

The ALJ also again evaluated Dr. Motzkin's medical evidence, finding that the treating physician's opinion could not be entitled to controlling weight.  Specifically, the ALJ found "nowhere in [Dr. Motzkin's] clinical notes where he ever specifically describe[d] [Ms. Young's]

functional capabilities to support his opinion[,] nor did he note specific limitations under which she could engage in work activities or that she even had limitations greater than those determined in [the ALJ's] decision."[17]  Additionally, Dr. Hare's opinion that Ms. Young could perform sedentary work and was not disabled effectively countered Dr. Motzkin's.  The ALJ therefore found that Ms. Young had the residual functional capacity to perform the full range of sedentary work, with limitations including work that did not require, among other things:  lifting more than 5-10 pounds at a time, standing or walking more than 15-20 minutes at a time, nor more than 2 hours in an 8 hour workday, sitting more than 30-45 minutes at a time, nor more than 6 hours in an 8 hour workday, stair climbing, overhead lifting or reaching, or work at more than a low stress level.[18]  Given these limitations and the testimony by Ms. Galli, the ALJ found that Ms. Young could not perform her past relevant work as addressed in step four.

At step five, the Commissioner had the burden of showing the existence of a significant number of jobs in one or more occupations in the national economy which Ms. Young could perform.  Given the vocational testimony by Ms. Galli and the testimony and evidence provided by Ms. Young, the ALJ found Ms. Young capable of making a successful adjustment to work existing in significant numbers in the national economy.  The ALJ therefore found Ms. Young "not disabled" within the framework of Medical Vocational Rule 201.21 for the time period from December 15, 1996 through August 27, 1998.  Accordingly, the ALJ denied Ms. Young's claim for disability insurance benefits during that time period, but did find Ms. Young's entitled to a

---

[17] A.R. at 325.

[18] *Id*. at 326.

closed period of disability from August 28, 1998 through May 8, 2000.

Ms. Young sought review of the ALJ's hearing decision from the Appeals Council.  On January 14, 2005, the Appeals Council denied Ms. Young's request for reconsideration. Therefore, the ALJ's decision is considered the final decision of the Commissioner.

Ms. Young appealed the ALJ's decision to the court.  She argues that the ALJ failed to undertake the appropriate analysis in rejecting the opinion of her treating physician, that the ALJ failed to appropriately evaluate her credibility, and that the ALJ incorrectly characterized the vocational expert's testimony.  The Commissioner counters that the ALJ properly stated specific and legitimate reasons for rejecting Ms. Young's treating physician's opinion, that the ALJ stated specific and legitimate reasons for his credibility finding, and the ALJ could rely on the vocational expert's testimony to support his finding that Ms. Young could perform other jobs existing in the significant number in the national economy.  Both parties have fully briefed this appeal to the court.

### III. STANDARD OF REVIEW

The court's standard of review is set forth in 42 U.S.C. § 405(g), which provides that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."  In other words, the court reviews the Commissioner's decision to ascertain whether it is supported by substantial evidence in the record and to evaluate whether the ALJ applied the correct legal standards.[19]  "Substantial evidence is more than a mere

---

[19] *Grogan v. Barnhart*, 399 F.3d 1257, 1261 (10th Cir. 2005); *see also Doyal v. Barnhart*, 331 F.3d 758, 760 (10th Cir. 2003).

scintilla and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[20]   The court must "meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met."[21]

## IV. DISCUSSION

Under the Social Security Act, the Social Security Administration is authorized to pay disability insurance benefits and Supplementary Security Income to persons who have a "disability."   A person is disabled only if her "physical or mental impairment or impairments are of such severity that [she] is not only unable to do his previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."[22]

In order to determine whether a Social Security claimant is disabled, the Commissioner has developed a five-step evaluation.[23]   The claimant bears the burden of proof for steps one through four, and if the claimant fails to meet the burden of proof, consideration of any subsequent steps is rendered unnecessary.[24]   As the Tenth Circuit explained in *Fischer-Ross v.*

---

[20] *Grogan*, 399 F.3d at 1261; *see also Richardson v. Perrales*, 402 U.S. 389, 401 (1971).

[21] *Grogan*, 299 F.3d at 1262.

[22] 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

[23] 20 C.F.R. § 404.1520; *Williams v. Bowen*, 844 F.2d 748, 750-52 (10th Cir. 1988).

[24] *Id*. at 750.

*Barnhart*:[25]

> Step one requires a claimant to establish [he] is not engaged in substantial gainful
> activity.  Step two requires the claimant to establish [he] has a medically severe
> impairment or combination of impairments.  Step three asks whether any medically
> severe impairment, alone or in combination with other impairments, is equivalent to any
> of a number of listed impairments so severe as to preclude substantial
> gainful employment.  If listed, the impairment is conclusively presumed disabling.  If unlisted,
> the claimant must establish at step four that [his] impairment prevents [him] from
> performing work [he] had previously performed.  If the claimant is not considered
> disabled at step three, but has satisfied [his] burden of establishing a prima facie case of
> disability under steps one, two, and four, the burden shifts to the Commissioner to show
> the claimant has the residual functional capacity (RFC) to perform other work in the
> national economy in view of [his] age, education, and work experience.[26]

A. *The ALJ Properly Stated Specific and Legitimate Reasons for Rejecting Ms. Young's*
*Treating Physician's Opinion.*

Ms. Young argues that the ALJ's decision did not have substantial evidence to support

the ALJ's finding that Ms. Young retained the residual functional capacity to perform the

requirements of her past relevant work.  Dr. Motzkin, one of Ms. Young's treating physicians,

did offer answers to Ms. Young's counsel's letter sent July 23, 1997.  Ms. Young's counsel

provided a letter stating that he represented Ms. Young in her claim for social security benefits.

The letter requested that Dr. Motzkin respond to the following questions, and that he could

simply write his responses at the bottom of the letter and fax it back to the counsel.  The letter

stated:

> 1. Do you expect there to be an improvement in Ms. Young's pain? [*written*: "No."]
> 2. Is there an objective basis for Ms. Young's pain? [*written*: "Consistent painful physical
> exam over time."]

---

[25] 431 F.3d 729 (10th Cir. 2005).

[26] *Id*. at 731 (citations and quotations omitted).

    3. Is it reasonable for Ms. Young's pain to be of such severity that she must miss two to three days of work per week? [*written*: "Yes."][27]

Based on these answers, Ms. Young argues that the ALJ did not give specific legitimate reasons for rejecting Dr. Motzkin's opinions stated in this form letter.

    In fact, it is clear that the ALJ gave specific, legitimate reasons for rejecting Dr. Motzkin's opinion regarding Ms. Young's functional capacities.  The ALJ cited to Dr. Motzkin's previous opinion of March 1997, finding that Ms. Young had a good range of motion and suggested that Ms. Young was not totally disabled, but partially permanently disabled.[28]  In May 1997, Dr. Motzkin noted minimal findings that Ms. Young was diffusely tender around the shoulder.[29]  On July 23, 1997, however, Dr. Motzkin provided the answers to counsel's letter without providing any further medical evidence or support for his opinion.  The ALJ then examined Dr. Motzkin's clinical notes for any specific description of Ms. Young's functional capabilities to support his opinion.  The ALJ also scoured the record for any of Dr. Motzkin's clinical notes that described specific limitations under which Ms. Young could engage in work activities or any support for the assertion that she had any limitations greater than the ALJ had already noted.

    Ms. Young argues that the ALJ failed to engage in the proper analysis set out in *Goatcher v. Dep't of Health & Hum. Servs.*,[30] and the ALJ therefore erred in his decision.  *Goatcher*

---

[27]A.R. at 166.

[28] *Id*. at 325.

[29] *Id*.

[30] 52 F.3d 288, 290 (10th Cir. 1995).

requires a treating physician's opinion be given substantial weight unless good cause is shown to

disregard it.  The ALJ "must give specific, legitimate reasons for disregarding the treating

physician's opinion that a claimant is disabled."[31]

> In addition, the ALJ must consider the following specific factors to determine what
> weight to give any medical opinion: (1) the length of the treatment relationship and the
> frequency of examination; (2) the nature and extent of the treatment relationship,
> including the treatment provided and the kind of examination or testing performed; (3)
> the degree to which the physician's opinion is supported by relevant evidence; (4)
> consistency between the opinion and the record as a whole; (5) whether or not the
> physician is a specialist in the area upon which an opinion is rendered; and (6) other
> factors brought to the ALJ's attention which tend to support or contradict the opinion.[32]

Ms. Young argues that the ALJ failed to perform this analysis, and that the ALJ's decision erred

by failing to give conclusive weight to Dr. Motzkin's July 23, 1997 opinion.

The ALJ's most important conclusion is that "nowhere in [Dr. Motzkin's] clinical notes

[does Dr. Motzkin] specifically describe claimant's functional capabilities to support his opinion

nor [does] he note specific limitations under which she could engage in work activities or that

she even had limitations greater than those determined in this decision."[33]  Ms. Young argues that

"the ALJ's opinion that Dr. Motzkin's clinical notes did not present objective findings to support

the doctor's conclusion was unsupported."[34]  Interestingly, Ms. Young fails to provide any further

documentary support *from Dr. Motzkin's clinical notes* supporting Dr. Motzkin's handwritten

answers to Ms. Young's counsel.  Rather, Ms. Young only argues that the "six shoulder

---

[31] *Id*.

[32] *Id*. (citing 20 C.F.R. § 404.1527(d)(2)-(6)).

[33] A.R. at 325.

[34] Ms. Young's Appeal Brief, at 8.

surgeries," "the repeated trigger point findings and injections" and the "possibility of an autoimmune disorder when Plaintiff's pain responded to the chemotherapy [after August 28, 1998]" all validate Dr. Motzkin's objective findings.[35]  Unfortunately, Ms. Young's argument lacks validity, as she points to some things that Dr. Motzkin did not analyze, and she fails to point to any of Dr. Motzkin's clinical notes to support his July 23, 1997 opinion.  The court reviewed the record and has failed to find any support for Ms. Young's argument.  Indeed, the lack of Dr. Motzkin's clinical notes supporting the July 23, 1997 handwritten answers is close to fatal to her position, especially because the lack of support is exactly what the ALJ could not find in the record.

The ALJ's refusal to give Dr. Motzkin's July 23, 1997 opinion substantial weight in his decision was supported by specific, legitimate reasons.  Dr. Motzkin's opinion was not well-supported and was inconsistent with other substantial evidence.[36]  The ALJ did not err in disregarding Dr. Motzkin's July 23, 1997 answers to Ms. Young's counsel's letter absent any other supporting documentation from Dr. Motzkin's clinical notes and Dr. Hare's contrary opinion and notes.  Therefore, the court finds the ALJ appropriately offered specific, legitimate reasons for disregarding Dr. Motzkin's opinion.  And the ALJ reasonably relied upon Dr. Hare's opinion, which found Ms. Young able to perform sedentary work.

*B. The ALJ Appropriately Evaluated Ms. Young's Credibility.*

Ms. Young argues that the ALJ failed to engage in the analysis required under *Luna v.*

---

[35] *Id*. at 9.

[36] *White v. Barnhart*, 287 F.3d 903, 907 (10th Cir. 2001) (citing 20 C.F.R. § 1527(d)(2)).

*Bowen*[37] regarding her credibility.  Ms. Young complains circuitously that the ALJ failed to analyze the *Luna* factors and therefore failed to consider her subjective complaints of pain to find her disabled under step four.  Indeed, when considering whether pain is disabling, the ALJ must consider such things as "the claimant's daily activities, and the dosage effectiveness, and side effects of medication. . . . Of course no such list can be exhaustive."[38]  Ms. Young argues that the ALJ's decision, relying upon the objective medical evidence and the subjective complaints by Ms. Young and her negative credibility determination, was not proper.

It is clear that Ms. Young's repeated shoulder surgeries and trigger point injections were capable of producing pain.  It is also clear, however, that the ALJ analyzed the evidence as a whole and properly found that Ms. Young's testimony of subjective complaints and functional limitations she alleged was not supported and lacked some credibility.  First, the ALJ pointed to the lack of objective findings to support the limitations described by Ms. Young.  He noted on careful reconsideration of the record that, with appropriate treatment and medication and the proper work environment, Ms. Young's pain, symptoms and precipitating and aggravating factors could have been controlled to allow her to perform a significant but limited range of work activity from December 15, 1996 through August 27, 1998.  Indeed, the ALJ noted that Ms. Young more than once indicated that she was better and improving, and that improvement indicated that Ms. Young's claims of debilitating pain were not fully credible.

---

[37] 834 F.2d 161 (10th Cir. 1987).

[38] *Id.* at 166. (citing *Polanski v. Heckler*, 751 F.2d 943, 948 (8th Cir. 1984), *vacated and remanded on other grounds*, 476 U.S. 1167 (1986)).

Second, the ALJ specifically found that "claimant's failure to follow through with recommended treatment . . . continues to negatively affect her credibility just as it did previously." The record indicates several instances where Ms. Young did not engage in the recommended physical therapy activities. On April 30, 1998, Anne England noted that Ms. Young's "progress has been hindered by a negative focus . . . . In pool patient often has refused to do the activities as asked[,] often stat[ing] she would like to go home and take her medication. . . . Follow through with stretching program at home has been poor. . . . Has refused any type of advice or therapy concerning vocational deficits."[39]  On June 4, 1998, Dr. Hare noted that Ms. Young "states that she has not been engaging in her home exercise program nor her self-management techniques."[40]  Dr. Hare noted that Ms. Young "is not compliant with this program [of activating physical therapy, relaxation techniques and cognitive coping skills provided by the psychology staff] and continues to complain of pain and display marked pain behaviors despite not engaging in our current treatment plans."[41]  Again, on July 27, 1998, Dr. Hare noted "Non compliance with home exercise program [and] focus on obtaining disability."[42]  On August 10, 1998, Ms. Young reported that her pain was controlled with methadone and was not the primary issue nor a significant issue for her at that time.[43]  And on October 12, 1998, Ms. Young reported

---

[39] A.R. at 504.

[40] *Id*. at 488.

[41] *Id*.

[42] *Id*. at 487.

[43] *Id*. at 483.

"no exercise because she feels she does not have enough strength . . . [and] noncompliance with home exercise program."[44]

Ms. Young points to several parts of the record to show that she performed her physical therapy.  Indeed, there are instances in the record demonstrating that Ms. Young did engage in her treatment and physical therapy.  At the same time, there are clearly a number of instances, demonstrated above, when Ms. Young did not engage in her therapy and did not comply with her home exercise programs or other treatment.  The ALJ relied on these statements in the record, many admitted to by Ms. Young, to find that Ms. Young was not compliant with her prescribed treatment.

Despite the evidence in the record and the discussion in the ALJ's decision, Ms. Young still claims that the ALJ failed to conduct the required analysis regarding refusal of treatment. Ms. Young relies on *Ragland v. Shalala*,[45] requiring the ALJ to consider "(1) whether the treatment the treatment at issue would restore claimant's ability to work; (2) whether the treatment was prescribed; (3) whether the treatment was refused; and, if so, (4) whether the refusal was with justifiable excuse."[46]  The ALJ did not deny Ms. Young benefits on the ground that she failed to follow prescribed treatment.  "Rather, the ALJ properly considered what attempts [Ms. Young] made to relieve [her] pain – including whether [she engaged in all her physical therapy and treatment] – in an effort to evaluate the veracity of [Ms. Young's]

---

[44] *Id*. at 481.

[45] 992 F.2d 1056, 1060 (10th Cir. 1993).

[46] *Frey v. Bowen*, 816 F.2d 508, 517 (10th Cir. 1987).

contention that [her] pain was so severe to be disabling."[47]  In any event, the treatment was

clearly prescribed by the treating physicians, especially when those physicians noted Ms.

Young's continual noncompliance with several of her programs at times.  The noted

noncompliance clearly indicates Ms. Young's refusal of that treatment at certain times.  Ms.

Young offered no justifiable excuse, although she indicates in her brief that she had insurance

problems and some difficulty due to increased pain.  Although the ALJ did not specifically

examine whether the treatment at issue would restore Ms. Young's ability to work, the record

indicates at times that further treatment improved her pain issues, improving her range of motion,

strength and lessened her pain.[48]  The record is clear that Ms. Young's treatment gradually

improved her pain issues, and it is also clear that Ms. Young did not comply with her treatment

numerous times.

     The ALJ properly analyzed Ms. Young's submitted evidence and her testimony, finding

that her failure to follow through with recommended treatment at times negatively affected her

credibility.  This court "generally treat[s] credibility determinations made by an ALJ as binding

upon review."[49]  "So long as the ALJ sets forth specific evidence he relies on in evaluating the

---

[47] *Qualls*, 206 F.3d at 1372-73.

[48] *See, e.g.*, A.R. at 227 ("she feels that she is somewhat improving."); *id.* at 225 ("Ms. Young returns to the Pain Management Center today reporting that she was doing much better after the trigger point injections last week, but she did miss an appointment and as a result . . . feels that her pain has flared up to its original level. . . . She does state that she is doing her stretching and her exercises and feels that these have been of some value to her."); *id.* at 223 ("The patient reports that she is making some gradual improvement. . . . [S]he reports sustained improvement . . and ability to do her stretching and exercise programs.").

[49] *Shephard v. Apfel*, 184 F.3d 1196, 1202 (10th Cir. 1999).

claimant's credibility, the dictates of *Kepler* [*v. Chater*][50] are satisfied."[51]   There is ample

evidence of the ALJ's specific, legitimate reasons for his comments on Ms. Young's credibility,

and the court finds that the ALJ met the proper standard in accessing her credibility.

Accordingly, the ALJ did not err in discounting about Ms. Young's credibility while evaluating

her impairments and residual functional capacity.

> *C. The ALJ Properly Addressed the Vocational Expert's Testimony and Properly Relied Upon that Testimony in His Decision.*

The ALJ properly determined that Ms. Young had the residual functional capacity to

perform the full range of sedentary work with a limited number of specific work restrictions.  At

that point, the ALJ then relied on requested testimony from a vocational expert regarding existing

jobs in the national economy that fit with Ms. Young's limitations.  Ms. Galli offered three jobs,

discounting the approximate numbers of those jobs in the economy given Ms. Young's specific

work restrictions.  Those three jobs – telephone quotation clerk, semi-conductor bonder and call-

out operator – all considered sedentary and found in approximate numbers of between 26,800

and 40,000 nationally, constituted the employment Ms. Young could engage in that existed in

significant numbers in the national economy.  It is true that Ms. Young was limited to working

only occasionally with the general public personally or by telephone, and therefore the telephone

quotation clerk job would not be appropriate based on Ms. Young's limitations.  But the other

---

[50] 68 F.3d 387, 391 (10th Cir. 1995) (holding ALJ's credibility determination inadequate because ALJ simply recited the general factors he considered and then said claimant was not credible based on those factors).

[51] *Qualls v. Apfel*, 206 F.3d 1368, 1372 (10th Cir. 2000).

two jobs (semi-conductor bonder and call-out operator) fell within the vocational expert's testimony and the ALJ's proffered hypothetical based on the ALJ's decision.

This situation mirrors the Tenth Circuit's decision in *Qualls v. Apfel*.  "The ALJ propounded a hypothetical question to the [vocational expert] that included all the limitations the ALJ ultimately included in his RFC assessment.  Therefore, the [vocational expert's] answer to that question provided a proper basis for the ALJ's disability decision."[52]  Indeed, by examining the evidence offered by the vocational expert's testimony and the record before him, the ALJ properly found that Ms. Young could perform jobs existing in significant numbers in the national economy.[53]  Accordingly, the court finds that the ALJ properly relied upon the vocational expert's testimony to support his finding that Ms. Young could perform these jobs and was not disabled.

---

[52] *Qualls*, 206 F.3d at 1373.

[53] *See, e.g.*, *Qualls v. Apfel*, 206 F.3d 1368, 1372 (10th Cir. 2000); *Gay v. Sullivan*, 986 F.2d 1336, 1341 (10th Cir. 1993).

## V. CONCLUSION

Finding that there was substantial evidence supporting the decision to deny Ms. Young disability insurance benefits and SSI for the closed period from December 15, 1996 through August 27, 1998, the court affirms the ALJ's and Commissioner's decision.  The court also DENIES Ms. Young's motion for judgment on the pleadings [#9].  The Clerk of the Court is directed to close the case.

DATED this 23rd day of June, 2006.

BY THE COURT:

_____
Paul G. Cassell
United States District Judge